FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 FEB -2 PH 12: 37

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MYERS C. ("MIKE") THURMAN | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 00-0191 c/w 00-0227 |
| | * | |
| TRANSOCEAN SEDCO FOREX, | * | SECTION: K |
| INC., formerly TRANSOCEAN | * | |
| OFFSHORE, INC. | * | MAGISTRATE (5) |
| | * | |
| | * | JURY TRIAL REQUESTED |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PRE-TRIAL ORDER

1.    A Pre-Trial Conference was held in the captioned cases on January 23, 2001 at 1:00 p.m.

Honorable Stanwood R. Duval, Jr., U.S. District Judge, presiding.

2.    **APPEARANCES:**          **PLAINTIFF: MYERS C. ("MIKE") THURMAN**
Harvey J. Lewis, T.A. (#8840)
Lewis, Kullman & Sterbcow
601 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
Telephone: (504) 588-1500

Joseph H. Montgomery, Esq.
Williams, Williams & Montgomery, P.A.
109 Erlanger Street/P. O. Box 113
Poplarville, Mississippi 39470
Telephone: (601) 795-4572

**DEFENDANT: TRANSOCEAN SEDCO FOREX,
INC., formerly TRANSOCEAN OFFSHORE, INC.**
Timothy W. Cerniglia, T.A. (#3964)
Michael Reese Davis, Esq. (#17528)
Sharp, Henry, Cerniglia, Colvin & Weaver, L.L.C.
2117 World Trade Center
#2 Canal Street
New Orleans, Louisiana 70130
Telephone: (504) 586-1555

DATE OF ENTRY
FEB 0 5 2001

Fee _____
Process _____
X  Dktd _____
___ CtRmDep _____
Doc.No. _____

1

3.    **PARTIES:**

**Plaintiff:**

In CA#00-0191, plaintiff, Mike Thurman, a drill barge seaman, sued his employer, Transocean Sedco Forex, Inc., formerly Transocean Offshore, Inc. (hereinafter "Transocean"), for damages under the Jones Act and general maritime law on account of the unseaworthiness of the employer's vessel. Then, after Transocean refused to pay for surgery prescribed by the Plaintiff's attending physician, Plaintiff filed CA#00-0227, a Rule 9(h) proceeding, against Transocean for maintenance, cure and compensatory damages on account of the employer's failure to provide maintenance, pay for cure and also seeking compensatory damages for additional injuries caused by Transocean's conduct.

Recently it was determined that Transocean Offshore Ventures, Inc., a wholly owned subsidiary of Transocean Sedco Forex, Inc., rather than the parent company which is the proper party defendant and substitution will be made by unopposed motion or stipulation.

**Defendant:**

Transocean Offshore Ventures Inc., (hereinafter "Transocean") is a foreign corporation, which at all time pertinent, was licensed to do and doing business in the State of Louisiana and within this district.

4.    **JURISDICTION:**

Jurisdiction of this civil action, based on the Jones Act and/or general maritime law, is conceded by the parties and found by the Court to be present with respect to CA#00-0191.

Jurisdiction, based on the general maritime law, admiralty, is conceded by the parties and found by the Court to be present with respect to CA#00-0227.

5.    **MOTIONS:**

Plaintiff will move to substitute Transocean Offshore Ventures, Inc., a wholly owned subsidiary of Transocean Sedco Forex, for Transocean Sedco Forex, Inc., formerly Transocean Offshore, Inc., as that party has been determined to be owner and operator of the D/B GEORGE RICHARDSON, the employer of that vessel's crew, including the plaintiff and thus the proper defendant.

Transocean intends to file a Motion in Limine regarding special issues appropriate for determination in advance of trial and merits.

6A.    **PLAINTIFF'S STATEMENT OF MATERIAL FACTS:**

Plaintiff, Mike Thurman, started working for Transocean or its predecessor companies on January 12, 1990. Shortly thereafter, he was permanently assigned to work as a subsea engineer, a highly-skilled technical position aboard the D/B GEORGE RICHARDSON. Transocean's subsea engineers (SSEs) install, operate and maintain the pneumatic and other devices that power the well control device (BOP stack) located on the sea bed. The crew of the D/B GEORGE RICHARDSON normally include two SSEs, who work together daily from 6:00 a.m. to 6:00 p.m. in 14 day hitches. Frequently, this drill barge has three SSEs aboard as was the situation in the week before and the week after the hitch when the plaintiff was injured. In 1993, he was involved in a casualty aboard that vessel and suffered severe injuries to his neck, right knee and left shoulder. He underwent surgery to repair his knee in 1993 and to correct a torn rotator cuff in his left shoulder in 1995, and then, in 1996, he

3

underwent surgery at two levels to repair the disc damage in his cervical spine. After a protracted, but successful, convalescence, he was allowed to resume work as an instructor teaching subsea engineer trainees their job at Transocean's facility near Morgan City. Some time in late 1997, there was an opening for a senior subsea engineer on the D/B GEORGE RICHARDSON, and the Plaintiff was approached about that job because of his experience and skill. Transocean classified the work of a senior subsea engineer as "heavy labor." And, because this job was physically demanding, Transocean insisted on obtaining an updated disability assessment from Dr. Molleston, the neurosurgeon who had operated on the plaintiff in 1996 and had followed him periodically thereafter. Transocean's claims manager forwarded a copy of the Job Description of a Transocean Senior Subsea Engineer and asked for Dr. Molleston's views. On May 13, 1998, Dr. Molleston responded, in writing, to Transocean's claims manager, stating that the plaintiff was physically incapable of doing the job as described; that the restrictions he reported in September 1996, still applied, i.e., limited climbing and overhead work; no lifting over 30 pounds ever and up to 10 pounds only occasionally. In that correspondence, Dr. Molleston specifically recommended that the plaintiff should only be doing supervisory work and that he should be furnished a helper to do the manual tasks.

Subsequently, the plaintiff was told that he could return to work on the D/B RICHARDSON within the terms and limitations set down by Dr. Molleston, and it was his understanding that the Offshore Installation Managers (hereinafter OIMs), who were in overall charge of operations, and the toolpushers working on that D/B RICHARDSON, who were the plaintiff's immediate supervisors, had been told of those restrictions as had the

4

vessel's shore-based rig supervisors. It is not clear exactly who really knew about these restrictions, but Bobby Westbrooks, the OIM on the D/B RICHARDSON at the time the plaintiff was injured, admitted he knew that the plaintiff was to do no manual labor and that he needed assistance for such tasks and that it was his responsibility to pass on this information to Buddy Ingram, the vessel's toolpusher and plaintiff's immediate supervisor, who ordered the plaintiff to do the heavy work that caused his injury. Ingram testified that he received no such information and that he thought that the plaintiff was able-bodied and fully capable of doing any task requested of a subsea engineer. Also, Carl Jordan, the OIM who relieved Westbrooks, said he, too, was completely unaware that Thurman had any restrictions or vocational limitations.

In any event, plaintiff returned to work on the D/B RICHARDSON in June 1998, and he did his job satisfactorily according to his supervisors. Usually, he was furnished help whenever it was needed and, although he had headaches and occasional neck and left shoulder pain on account of his 1993 injuries, plaintiff, then age 61, was very happy to be back, working on the D/B GEORGE RICHARDSON because he preferred it to the classroom and because he made more money. He was earning $6,090, plus found instead of the $5,365.60 per month that he was paid while working as an instructor.

Plaintiff worked without incident or undue difficulty until the early evening of August 21, 1999, when about 7:00 p.m., he re-injured his neck and tore the rotator cuff in his right shoulder. These injuries occurred because the plaintiff was effectively ordered to do heavy manual labor by Toolpusher Ingram because there was no one else available to do it and this task had to get done.

The events leading up to this incident and the injuries, which required the plaintiff to have repeat surgery on his neck and on his right shoulder and which now render him totally and permanently incapable of doing any work, started the day before, August 20, 1999 at 6:00 p.m.

At that time, orders went out to shut down operations and evacuate the drill barge on account of an approaching hurricane. Ordinarily, such orders are given sixty hours before the evacuation needs to be completed, but on this occasion, the crew had just under thirty hours to secure the rig and evacuate the vessel. In these emergency circumstances, some of the shutdown tasks were done out of the normal order and others remained undone, obviously, because preparations were not started soon enough.

Under Transocean's normal evacuation procedure, the crew, just completing its 12 hour work period, would be evacuated first as would virtually all non-Transocean personnel. That would have left the Transocean OIM, a toolpusher, two subsea engineers, including the plaintiff, and 24 other Transocean crew members, including five roustabouts, who ordinarily do the heavy manual labor. According to the helicopter company's logs, the first helicopter flight to evacuate people aboard this drill barge, arrived at 4:48 p.m. and departed at 6:00 p.m. on August 21, 1999. Nine people were evacuated in this flight, including at least four of the five roustabouts in the remaining crew. Additionally, Randy Farmer, the other SSE was sent in early – over his protest and it is unclear whether it was on this flight or earlier. Moreover, these nine helicopter passengers had quit working and had started getting ready to leave at least an hour before their helicopter was scheduled to arrive. Of the crew members that remained, many had skilled positions such as the radio operator, the crane operator, the

6

ballast control officer and the barge electrician, who had their own shut down tasks and were not available to assist the plaintiff. In sum, these records show that between 6:00 p.m. on August 20, and 6:00 p.m. on August 21, 1999, at least 30 of the 58 Transocean crew members had been evacuated, including the plaintiff's helper, unquestionably leaving the vessel's crew shorthanded.

The subsea engineers are not part of the essential shut down crew and in an evacuation mode, only one subsea engineer is required. By approximately 4:00 p.m. on August 21, all of the technical tasks that required a subsea engineer's expertise had been completed. However, other tasks, including respooling this hose remained to be done and it required heavy manual labor. Instead of sending the plaintiff in on the helicopter that departed at 6:00 p.m. and letting Randy Farmer, the other SSE, an able-bodied man, to finish up, the OIM sent in Mr. Farmer even though this SSE protested the OIM's decision. As a consequence, the plaintiff, with his disabilities and limitations, was left with this shorthanded crew to finish securing the drill barge.

Around 7:00 p.m. on August 21, 1999, one of the remaining tasks was to respool the long, heavy pneumatic hose on the huge storage reel. This job requires a minimum of four and often six to eight people because it is necessary to first take slack out of the heavy hose to make sure it goes on the reel evenly without any overlap. This requires at least two people to get in front of the reel lifting up sections of the hose while at least two other people on the back side of the reel pull down on the hose to get out the slack. At the time, the only people available were the toolpusher, two floor hands and the plaintiff. When the toolpusher and the two floor hands were unable to do this task; the toolpusher ordered the plaintiff to help. In

7

these circumstances, plaintiff had no alternative but to assist in getting this crucially important hose properly stowed. There was no one else available.

As he lifted up the heavy load, the plaintiff felt a pop in his right shoulder and a sharp pain radiating from the base of his neck. He immediately reported what happened to his toolpusher, who was on the other side of the reel helping pull the rope in place.

The plaintiff was finally evacuated from the drill barge at 9:45 p.m. on the next to last helicopter flight that left the drill barge on the evening of August 21, 1999.

The Transocean crew was taken to a motel in Houston, Texas with the last group arriving in the early hours of August 22, 1999. That morning, the plaintiff's neck hurt and his shoulder was so sore he could not raise his arm to shoulder level. At breakfast, the plaintiff told Randy Farmer, his SSE helper, about his pain that morning and asked him to pull on his right arm in an effort to unfreeze his shoulder.

The crew waited in Houston for the hurricane to clear the rest of that day and then they returned to the drill barge on August 23, 1999, which was the last day of the plaintiff's hitch. He left on the 24th and drove from Galveston to his home located north of Picayune, Mississippi. He saw Dr. Molleston a few days later on August 30, 1999. After examining the plaintiff, the doctor thought his patient had suffered a new neck injury and he asked Transocean to authorize an MRI in order to make a definitive diagnosis.

On September 1, 1999, Dr. Molleston sent a note, stating that plaintiff could not work because he had a neck injury. When the plaintiff took this note to the barge at the end of his 14 days off, he was told to leave the vessel by helicopter almost immediately and go to Covington, Louisiana to be examined by Dr. John Logan, an orthopedist that Transocean pays

over $100,000 a year. This doctor ordered an MRI on the plaintiff's neck and his right shoulder. Then, apparently, before getting the results which showed inter alia, a torn rotator cuff, in plaintiff's right shoulder, the defendant's doctor reported on September 8, 1999 that (a) Dr. Molleston had accurately assessed the plaintiff's condition and disability in May 1998; (b) that he was unfit to work as a subsea engineer or any heavy work; and (c) that he had reached maximum medical improvement. Even more remarkably, Dr. Logan made no mention of the positive MRI showing the torn rotator cuff.

Although the Defendants refused to authorize or pay for any further treatment, the plaintiff's right shoulder rotator cuff tear was repaired on February 21, 2000 and on March 10, 1999, Dr. Molleston did a three-level posterior cervical decompression at the C3-4, C5-6 and C6-7 levels. Notably, the previous surgery in 1996 was limited to the C4-5 and C5-6 levels. Serious complications interrupted the procedure, but Dr. Molleston succeeded in decompression, although he did not finish the operation.

Plaintiff's unpaid medical bills for the neck and right shoulder surgery total $31,469.60.

Before these new injuries, the defendants insisted on a disability/impairment rating by Dr. Stephen Beam, who on February 17, 1999, concluded that the plaintiff had a 33% whole person impairment rating as a result of injuries to his neck and left shoulder. Now he is 100% disabled.

He has had post-operative shoulder complications, i.e., adhesive capsulitis (a "frozen shoulder"). His neck is still painful and his range of motion is severely restricted. Plaintiff claims he could have and would have worked for at least three more years had this August

9

21, 1999 incident not occurred. As a result of this incident and plaintiff's totally disabling injuries he has suffered a wage loss of over $300,000.

### Negligence and Unseaworthiness Contentions in CA#00-0191

Plaintiff should never have been ordered and/or required to do heavy manual work in connection with the August 20-21 hurricane evacuation. He should have been sent in at the earliest opportunity and Randy Farmer, the other SSE, should have remained in place of the plaintiff as he requested. This failure, the undermanned crew and requiring plaintiff to do tasks that substantially exceeded his doctor's limitations constitute Jones Act negligence and failing to have a sufficient number of able-bodied crew members to do the assigned chores renders the D/B RICHARDSON unseaworthy.

### Contentions in the CA#00-0227

A seaman is entitled to maintenance and cure for any illness or injury that occurs while the seaman is in the service of his vessel. It is unnecessary to prove fault on the employer's part nor that the injury was causally related to the seaman's employment in any way. Illustratively, a seaman who contracts a disease in the course of voyage is entitled to maintenance and cure until he reaches maximum recovery.

It cannot be doubted that during the hurricane evacuation, the plaintiff tore his right rotator cuff and, at a minimum, aggravated his pre-existing cervical problems to the point that surgery was required. Dr. Logan never addressed the plaintiff's right shoulder in his report to Transocean despite the fact that the MRI he ordered clearly showed a torn rotator cuff. Although Dr. Logan felt that the plaintiff had reached maximum medical improvement with respect to his neck in early September 1999, despite positive findings and complaints of pain;

10

Dr. Molleston's subsequent surgery in six months; specifically the findings of damage at a different level than previously involved and worsened changes at the previously repaired levels prove that Logan was absolutely wrong in his diagnosis and disability assessment.

As a result of the defendant's refusal to provide cure, the plaintiff has medical and hospital bills totaling $33,174.60. He suffered unnecessarily for at least six additional months and it is thought this delay caused increased disability as well. The defendant has no valid basis for their conduct which was arbitrary and capricious. The plaintiff is entitled to have all of his medical bills paid, to recover $100,000 for his increased damages and $50,000 for attorneys fees or whatever amount the Court finds appropriate.

**6B.    DEFENDANT TRANSOCEAN'S STATEMENT OF MATERIAL FACTS:**

Transocean denies that there was an "accident" as such, or that plaintiff suffered any injury caused by negligence of Transocean or an unseaworthy condition of the RICHARDSON. Rather, the time in which the plaintiff claims he felt a "pop" and pain in his neck and shoulder, the rig was engaged in standard preparations for a rig evacuation because of an impending hurricane. The plaintiff was not required to work beyond any physical restrictions, and in fact did not. It is believed that plaintiff, dissatisfied with the retirement and disability settlement package that he was offered in response to his requests, has tried to develop a scenario to impose liability on Transocean. The plaintiff had actively sought out from Transocean a retirement and disability settlement package. Despite Transocean having made work available to plaintiff so that he could continue to earn wages and not be laid off, he found it increasingly more difficult to work offshore. He tired easily and often had to lie down and rest during normal working hours. He began discussions with Perry Hamburger

11

in late 1998 for a disability settlement and retirement package. Plaintiff broke off those discussions in October of 1999. This lawsuit followed shortly after.

In September of 1995 the plaintiff had arthroscopic surgery performed on his left shoulder as a result of chronic bursitis, impingement, and a torn rotator cuff. Later, on February 29, 1996, he underwent a two level cervical diskectomy and fusion. He returned to work after these surgeries. He continued to have problems, although he was to refrain from performing heavy work. In an effort to help Mr. Thurman maintain a position with Transocean that he could physically handle, Thurman was transferred in 1997 to a job as an instructor at a training school that Transocean had implemented. Essentially, Mr. Thurman was a land based instructor in a classroom setting. Here too, the plaintiff had to often lie down to rest.

However, Mr. Thurman did not like working in this position and wanted to return to work on the rigs. Nearly everyday of the school, he mentioned how much he wanted to return to the rigs. He asked Trina Allison, with Transocean, if there was any way he could return to work on the rigs. He had also spoken to his doctor about this. Trina Allison asked Dr. Molleston what restrictions should Mr. Thurman have if he were to return to work on the rigs. Dr. Molleston replied generally that he should not perform any work requiring lifting over 50 lbs. and essentially refrain from any heavy manual work

In an effort, again, to help Mr. Thurman maintain a job, Transocean made a position available to him as a Senior Sub Sea Engineer on board the RICHARDSON with the instructions that he was not to perform any heavy manual lifting. Transocean made allowances for his condition, as best it could. Bobby Westbrooks, an O.I.M. on board the

12

RICHARDSON specifically told Mr. Thurman that he was not to lift anything heavy and that anything that he needed to have done, he should ask for help.

Mr. Thurman returned to the RICHARDSON in that capacity in June of 1998. He was assigned a normal rotation two weeks on and two weeks off. There was usually two sub sea engineers on board, and sometimes three or four depending on activity on the rig, sometimes the plaintiff was the only subsea engineer on board.    Notwithstanding, Mr. Thurman, acting only in a supervisory type of capacity and refraining from heavy manual labor, it became increasingly difficult for him to maintain the rigors of working on an offshore oil rig. Mr. Thurman easily tired and became increasingly dissatisfied with his job on board the RICHARDSON. He pursued discussion with Perry Hamburger, the Risk Manager for Transocean, regarding retirement options and a disability settlement package. Transocean has a voluntary "Compensation Program" that provides for a lump sum disability payment under varying circumstances. As part of this, plaintiff underwent a functional and disability examination in which he was assigned a 33% to 34% permanent disability. It was agreed by all that the plaintiff could no longer work in his previous capacity offshore. He was offered a comprehensive settlement and retirement package by Mr. Hamburger. This was rejected by the plaintiff. The negotiations finally broke off in October of 1999. Shortly thereafter the plaintiff filed this suit alleging he was forced to work beyond his limitations during a hurricane evacuation.

At no time did the plaintiff ever report any injury or an accident to Transocean. At no time during any of the negotiations with Perry Hamburger did Mr. Thurman ever report having had an accident or an injury. When Mr. Thurman was sent to see Dr. John Logan on

September 1, 1999, approximately a week after the incident alleged in his complaint, he made no mention of having had any accident or injury. The first mention was to Dr. Molleston long after the negotiations for his retirement/disability settlement had broken off. Even at that time, the plaintiff did not mention to Dr. Molleston anything specific or any one particular incident, as he now claims.

At all times during the hurricane evacuation alleged by Mr. Thurman as the precipitating event, the usual compliment of crew was there to help perform the task of preparing the rig for abandonment. In fact, the procedure is identical to that of moving the RICHARDSON from one well to another, something that plaintiff did on numerous occasions with the same crew compliment, and generally within the same time frame in which this particular rig abandonment took place. The plaintiff was present for a hurricane evacuation in September 1998 in which a number of the same personnel were on board. The evacuation proceeded normally at this occasion as it had in the past. Also, the particular task that the plaintiff claims to have been performing at the time did not exceed his limitations. In short, there was no accident or injury caused by any negligence on the part of Transocean or any unseaworthy condition.

Moreover, the plaintiff has not established any lost wages, past or present. It was, and remains agreed by all, that the plaintiff could no longer work in his position as a subsea engineer, or in any capacity offshore.

Likewise, there has been no showing that any new injury or illness manifested itself while on board the vessel. Again, the plaintiff never reported any such incident. It is known that the plaintiff had similar complaints in April 1999, as part of determination of the amount

14

of disability to factor in to the plaintiff's retirement and disability settlement package. Also, Transocean was advised by Dr. John Logan after his examination of the plaintiff that the plaintiff was at maximum medical improvement, but should not be allowed to perform heavy manual labor in an offshore capacity.

7.    **STATEMENT OF UNCONTESTED MATERIAL FACTS**

(1)    Defendant, Transocean Offshore Ventures, Inc., is the proper party defendant.

(2)    The RICHARDSON was a "vessel" under General Maritime Law; and

(3)    Transocean Offshore Ventures, Inc., was the employer of the plaintiff at all times pertinent.

(4)    Transocean Offshore Ventures, Inc., was the owner *pro hac vice* and operator of the RICHARDSON.

(5)    Before allowing the plaintiff to resume work as a senior subsea engineer on the D/B GEORGE RICHARDSON in 1998, Transocean requested and obtained an evaluation and assessment of the plaintiff by Dr. Molleston, the plaintiff's treating neurosurgeon.

(6)    In 1999, the plaintiff was working his regular 14 day hitches as a senior subsea engineer aboard the D/B GEORGE RICHARSON, but he could not do heavy manual labor as a result of prior surgeries.

(7)    Transocean agreed to permit the plaintiff to return to work with the limitations and restrictions imposed by Dr. Molleston and the plaintiff resumed work as a senior subsea engineer under those conditions in June 1998. Thereafter, the plaintiff worked his regular 14 day hitches up to August 23, 1999.

(8)     In August 1999, the D/B GEORGE RICHARDSON was engaged in operations in the Gulf of Mexico south of Louisiana and Texas.

(9)     At 6:00 p.m. on August 20, 1999, orders were given to begin emergency evacuation procedures of the D/B GEORGE RICHARDSON because of a storm in the Gulf.

(10)    There were two SSEs aboard the D/B GEORGE RICHARDSON at this time, the plaintiff, who was the senior SSE, and Randy Farmer, who was the competent and able-bodied SSE II.

(11)    The emergency evacuation procedures continued the next day and by 4:55 p.m. on August 21, 1999, the rig move was complete, which means that all tasks requiring the technical expertise of a subsea engineer had been completed.

## 8.   CONTESTED ISSUES OF FACT:

(1)     Did the plaintiff suffer new injuries and/or aggravate old injuries during the period August 20-21, 1999 while working aboard the D/B GEORGE RICHARDSON?

(2)     What, if anything, caused the plaintiff to suffer those injuries?

(3)     If the plaintiff suffered new and/or aggravated old injuries, did they require medical treatment; if so

(4)     Did Transocean provide the plaintiff with maintenance and cure as required by law and if not why?

(5)     If the plaintiff suffered new and/or aggravated old injuries; did he do so as a result of performing manual labor as described in Paragraph 6(a) of this Pre-Trial Order; if so

(6)     Was the defendant negligent for causing, requiring or allowing the plaintiff to perform tasks in excess of Dr. Molleston's restrictions?

(7)     Was the D/B GEORGE RICHARDSON rendered unseaworthy for the reasons set forth in Paragraph 6(a)?

(8)     What injuries, if any, were caused by the defendant's negligence or by the unseaworthiness of the defendant's vessel?

(9)     Are plaintiff's medical expenses $33,174.60 or some other amount; if so, what is the correct amount which the defendant is required to pay, if any?

(10)    What amount of maintenance, if any, is the plaintiff entitled to recover?

(11)    Did the defendant arbitrarily and capriciously fail to pay maintenance and cure; if so

(12)    What additional injuries, if any, did the plaintiff suffer on account of that failure?

(13)    What amount of damages is the plaintiff entitled to recover, if any, as a result of:

    (a)     Defendant's negligence;

    (b)     The vessel's unseaworthiness; and

    (c)     Transocean's failure to pay maintenance or provide cure.

(14)    That the plaintiff had an accident on board the RICHARDSON on August 21, 1999;

(15)    That the plaintiff performed any work in excess of the plaintiff's limitations;

(16)    The extent to which the plaintiff's own negligence caused or contributed to his injuries;

(17)    That any new injury or illness manifested itself while plaintiff was in service of the ship;

(18)  That any unseaworthy condition on board the RICHARDSON caused or contributed to plaintiff's injuries;

(19)  That any negligence was the cause of the plaintiff's condition or injury;

(20)  The amount, if any, of future lost wages sustained by the plaintiff;

(21)  The amount, if any, of past lost wages sustained by the plaintiff;

(22)  The amount, if any, of general damages for pain and suffering sustained by the plaintiff; and

(23)  That Transocean was arbitrary or capricious in its conduct concerning Mr. Thurman's claim for cure.

(24)  Whether Randy Farmer was evacuated from the barge before the plaintiff.


9.    **CONTESTED ISSUES OF LAW:**

(1)  The relevance, if any, of the parties' settlement negotiations pertaining to the plaintiff's 1993 accident and injuries to the issues involved in this lawsuit.

(2)  Whether the defendant's conduct with respect to plaintiff's entitlement to maintenance and cure payments is sufficiently egregious to warrant the imposition of compensatory damages and/or attorney's fees.

(3)  That there was any negligence on the part of Transocean; and

(4)  That there were any conditions on board the RICHARDSON which rendered it unseaworthy.

(5)  That Transocean was arbitrary or capricious in its conduct concerning Mr. Thurman's claim for cure.

**10A.** **AMENDED LIST OF EXHIBITS TO BE INTRODUCED BY PLAINTIFF:**

(1)    IADC reports for the D/B RICHARDSON for August 1, 1999 to August 30, 1999.

(2)    Ballast Control Officer's Log for August 21, 1999.

(3)    Myers C. ("Mike") Thurman personnel file with Transocean, including periodic job performance evaluations.

(4)    Transocean's Job Description for Senior Subsea Engineer and Subsea Engineer.

(5)    Emergency Evacuation taken from Sonat's Policy and Procedure Manual.

(6)    Offshore Emergency Safety Manual for D/B RICHARDSON.

(7)    Transocean Policy Provisions regarding Incident Reporting.

(8)    Transocean Safety Management System Manual.

(9)    Drawings and/or diagrams of the (a) subsea assembly and risers and (b) pod hose, reel and components.

(10)    Arrivals and Departures lists for the D/B RICHARDSON for August 1999.

(11)    P.O.B. (Personnel on Board) for the D/B RICHARDSON for August 1999.

(12)    U. S. Department of Labor Tables providing life and work life expectancies.

(13)    All depositions taken in this matter, including exhibits attached to those depositions. *— only for impeachment*

(14)    Copies of hospital and physician medical bills, including pharmacy bills for plaintiff's treatment and surgeries in 1999 and 2000 by Drs. Molleston and Line.

(15)    Defendant's answers to Interrogatories and/or Defendant's responses to Request for Production in this matter. *only for impeachment*

(16)    Weather information/forecasts for August 18, 1999 to August 22, 1999.

(17)    Subsea logs for the D/B RICHARDSON for August 1999.

(18)    Plaintiff's tally book.

(19)    1993 accident report.

(20)    Petroleum Helicopters, Inc.'s Daily Flight Sheet August 21, 1999.

(21)    Copy of Joe Montgomery's letter to Transocean c/o Karen Cothran regarding payment for the plaintiff's medical treatment dated December 16, 1999.

(22)    Transocean Offshore Inc. Personnel/Payroll Notification Form dated June 9, 1998 for plaintiff.

(23)    <u>Medical records of Dr. Michael Molleston:</u>

 (a.)    Dr. Michael Molleston's Chart Note dated 9/18/96;

 (b.)    Dr. Michael Molleston's Chart Note dated 4/11/97;

 (c.)    Dr. Michael Molleston's Chart Note dated 8/11/97;

 (d.)    Dr. Michael Molleston's Chart Note dated 4/30/98;

 (e.)    Dr. Michael Molleston's letter to Trina Allison dated 8/13/97 enclosing copy of that doctor's 8/11/97 chart note;

 (f.)    Letter from Trina Allison to Dr. Molleston dated 4/23/98 enclosing Job Description of Subsea Engineer and inquiry about plaintiff's restrictions, etc.

 (g.)    5/13/98 letter from Dr. Molleston responding to Trina Allison's 4/23/98 inquiry;

 (h.)    Dr. Michael Molleston's Chart Note dated 5/14/98;

 (i.)    Dr. Michael Molleston's Chart Note dated 11/30/98;

 (j.)    Diagnostic/radiology reports from Wesley Medical Center dated 12/29/98;

20

      (k.)    Dr. Michael Molleston's Chart Note dated 1/25/99;

      (l.)    Dr. Michael Molleston's Chart Note dated 8/30/99;

      (m.)    Dr. Michael Molleston's Chart Note dated 9/1/99;

      (n.)    Dr. Michael Molleston's Operative Note for 1996 cervical surgery;

      (o.)    Dr. Michael Molleston's Chart Note dated 9/29/99;

      (p.)    Dr. Michael Molleston's Chart Note dated 11/3/99;

      (q.)    Dr. Michael Molleston's Chart Note dated 12/8/99;

      (r.)    Dr. Michael Molleston's Chart Note dated 1/24/00;

      (s.)    Dr. Michael Molleston's Chart Note dated 2/14/00;

      (t.)    Dr. Michael Molleston's Operative Note dated 3/10/00 for 2000 cervical surgery;

      (u.)    Dr. Michael Molleston's Chart Note dated 5/11/00;

      (v.)    Dr. Michael Molleston's Chart Note dated 6/28/00.

(24)    Dr. J. Stephen Beam's Report to Transocean dated 2/12/99 of the FCE/Disability Evaluation.

(25)    Dr. Srinivas S. Ganji Report to Dr. Sabatier dated 3/18/99.

(26)    <u>Medical Records of Dr. John Logan</u>:

      (a.)    Logan/Bryan Intake Note;

      (b.)    Logan prescription for MRI of neck and right shoulder dated 9/9/98;

      (c.)    Logan Report to Transocean;

      (d.)    Films and Radiology Reports covering September 9, 1999 MRI Studies of plaintiff's cervical spine and right shoulder made by Open MRI & Imaging Center.

(27)    <u>Medical records of Dr. Lawrence Line</u>:

      (a.)    Dr. Line's Chart Note dated 2/18/00;

      (b.)    Results of diagnostic tests on right shoulder;

      (c.)    Operative Note of plaintiff's 2/21/00 right shoulder surgery.

      (d.)    Dr. Line's Chart Note dated 2/21/00;

      (e.)    Dr. Line's Chart Note dated 2/24/00;

      (f.)    Dr. Line's Chart Note dated 3/23/00;

      (g.)    Dr. Line's Chart Note dated 4/19/00;

      (h.)    Dr. Line's Chart Note dated 5/18/00;

      (i.)    Dr. Line's Chart Note dated 8/4/00.

(28)    Any and all exhibits submitted by any other party in this matter.

Plaintiff reserves the right to introduce all correspondence, e-mails and notes of telephone conversations between Myers C. ("Mike") Thurman, Perry Hamburger, Karen Cothran or other Transocean employee or representative, including amounts if defendant is permitted to introduce any evidence about disability/retirement negotiations, including (a) Perry Hamburger's July 21, 1999 e-mail containing terms of disability/retirement package with notation regarding John Keeton and (b) Perry Hamburger's October 18, 1999 letter to the plaintiff, including attachments, i.e. "Sonat Compensation Plan" and Receipt and Release.

**Defendant objects to the following exhibits:**

> Any reference to amounts of retirement and disability settlement package in any correspondence, e-mails and notes of telephone conversations between Meyers C. Thurman, Perry Hamburger, Karen Cothran or other Transocean employee or representative in the personnel file or otherwise.

(12)    U.S. Department of Labor Tables providing life and work expectancies

(19)    1993 accident report

## 10B.    LIST OF EXHIBITS TO BE INTRODUCED BY DEFENDANT:

(1)    IADC Reports for the Semi Submersible the RICHARDSON for the dates of:

August 1, 1999 through August 23, 1999;

July 13, 1999 through July 14, 1999,

May 18, 1999 through May 20, 1999;

March 29, 1999 through March 31, 1999;

January 10, 1999 through January 13, 1999;

January 27, 1999 through January 28, 1999,

September 18, 1998 through September 22, 1998;

September 1, 1998 through September 4, 1998;

September 24, 1998 through September 30, 1998;

October 6, 1998 through October 20, 1998;

November 3, 1998 through November 17, 1998;

December 01, 1998 through December 15, 1998; and

23

December 29, 1998 through January 12, 1999.

(2)     Monthly Rig Treatment Logs for the RICHARDSON for Month of August 1999;

(3)     O.I.M. Log for the RICHARDSON for August 18 through 23, 1999;

(4)     Ballast Control Officer's Log for the RICHARDSON for August 18 through 23, 1999;

(5)     Sub Sea Engineer Log for the month of August, 1999;

(6)     Daily Flight Sheets, Load Manifest and Passenger List of Petroleum Helicopters, Inc. for the date of August 21, 1999;

(7)     Records of Unocal, Inc., (Spirit Energy) of any personnel or passenger list for transportation on August 21, 1999 from the RICHARDSON;

(8)     Personnel on Board and Arrival and Departure Logs for the RICHARDSON for August 18, 1999 through August 23, 1999;

(9)     Surrounding documents for incident or injury in February 1993;

(10)    First Report of Injury and related records for injury of May 17, 1993;

(11)    All correspondence, email, and notes of telephone conversations between plaintiff and Perry Hamburger, Karen Cothran, or any other Transocean employee or representative;

(12)    Plaintiff's personnel file with Transocean;

(13)    All of the following medical records, irrespective of whose individual records they may appear:

        A.      Medical Records of John Logan, M.D. in its entirety;

        B.      Medical Records of Dr. Michael Molleston:

24

a.)     Radiology report dated 2/14/00;

b.)     Correspondence from Dr. Molleston to T. Allison dated 9/18/96;

c.)     X-ray report dated 2/28/96;

d.)     Operative report dated 3/13/00;

e.)     Office notes dated 11/3/99;

f.)     Office notes dated 09/29/99;

g.)     Certificate to Return to Work of School dated 9/1/99;

h.)     Office notes dated 08/30/99;

i)      Correspondence from Dr. Molleston to T. Allison dated 5/13/98;

j.)     Office notes dated 8/11/97;

k.)     Office notes dated 4/11/97;

l.)     Correspondence from Dr. Molleston to T. Allison dated 9/18/96;

m.)     Office notes dated 3/25/96; and

n.)     Correspondence from Dr. Molleston to Dr. Line dated 1/8/96

C.     Medical Records of Gulf States Rehabilitation Associates:

a.)     Correspondence from Dr. Knight to T. Allison dated 4/21/99

D.     Medical Records of Wesley Medical Center:

a.)     Condition of Admission signed by M. Thurman on 12/29/??;

b.)     Radiology report dated 12/29/98

E.     Medical Records of Open MRI:

a.)     Screening form

F.     Medical Records of Neurology and Sleep:

        a.)     Correspondence from Dr. S. Ganji to Dr. Sabatier dated 3/18/99; and

        b.)     History and Physical notes dated 3/18/99

  G.    Medical Records of Work Well:

        a.)     Injured Worker Treatment Report dated 2/17/99

  H.    Medical Records of Dr. Richard Sabatier:

        a.)     Facsimile from Dr. R. Sabatier to K. Cothran dated 3/19/99;

        b.)     Facsimile from Dr. R. Sabatier to K. Cothran dated 4/20/99;

        c.)     Progress notes dated 3/10/99;

        d.)     Office notes from Dr. Molleston dated 4/30/98;

        e.)     Office notes from Dr. Molleston dated 11/30/98;

        f.)     Correspondence from Dr. Molleston to T. Allison dated 8/13/97;

(14)    Correspondence between plaintiff's counsel and Transocean;

(15)    Transocean's Voluntary Compensation Plan signed by plaintiff;

(16)    Any and all exhibits and attachments to depositions herein;

*for impeachment only*

(17)    Answers to discovery by all the parties herein;

(18)    Photographs and/or diagrams of plaintiff's Work Area on board the RICHARDSON; and

(19)    Plaintiff's deposition.

(20)    Monthly Rig Treatment Logs for the RICHARDSON for Month of June, July and August, 1999.

(21)    Handwritten procedure for pulling the risers.

(22)    Daily Drilling Report of August 21, 1999.

26

**Plaintiff objects to the following defense exhibits:**

Plaintiff objects to defense exhibits 11 and 12 to the extent that they exclude evidence of the amount of any settlement retirement package discussions, if such documents are admissible at all.

11.     **DEPOSITION TESTIMONY THAT MAY BE USED AT TRIAL:**

A.     Plaintiff may call the following witnesses by deposition:

a.     John B. Logan, M.D.

b.     Stephen Beam, M.D.

c.     James Randall Farmer

d.     Bobby Westbrooks

e.     Michael Molleston, M.D.

f.     James O. Ingram

g.     Carl Jordan

B.     Defendant may call the following witnesses by deposition:

a.     John B. Logan, M.D.

b.     J. Stephen Beam, M.D.

c.     James Randall Farmer

d.     Bobby Westbrooks

e.     James O. Ingram

f.     Carlon Craig

g.     Carl Jordan

The parties reserve the right to use any deposition testimony taken in this matter, including the deposition of any witness who may be unavailable for the trial of this matter.

## 12.    CHARTS, GRAPHS, MODELS, ETC.:

Plaintiff may use a timeline chart of liability and medical facts; schematic charts or drawings depicting positions of vessels, platform direction of seas, liability theories and damages.

Defendant has no objection to the use of charts or diagrams by the plaintiff in opening remarks or closing arguments. Defendant may use enlarged charts, or boards of documents or summaries of documents.

## 13A.    PLAINTIFF'S LIST OF WITNESSES:

**Plaintiff will call the following witness:**

(1)    Myers C. Mike Thurman, Jr.
4720 Highway 11 North
Purvis, Mississippi 39475
Fact witness - Regarding the facts and circumstances involved in August 21, 1999 casualty, his work, condition, injuries, medical treatment before and after this incident from 1993 to present date and his employment plans prior to August 1999 casualty.

**Plaintiff may call the following witnesses:**

(1)    Oneida Stringer Thurman
4720 Highway 11 North
Purvis, Mississippi 39475
Fact witness - Regarding husband's condition, activities, before and after August 21, 1999 casualty.

28

(2)    Myers C. ("CARR") Thurman
       (Address to be provided)
       Fact witness - Regarding his father's condition and activities before and after this
       casualty and his father's employment plans.

(3)    Perry Hamburger
       5342 Hidalgo Drive
       Houston, Texas 77056
       Fact witness - Regarding his reasons for not paying or authorizing payment for the
       plaintiff's medical care after August 21, 1999 and his insisting on plaintiff signing
       complete release before paying any benefits to the plaintiff.

(4)    Karen Cothran
       820 South Pin Oak
       Pearland, Texas 77581
       Fact witness - Regarding communications with Dr. Logan regarding Thurman and
       amounts Transocean pays that doctor.

(5)    James "Buddy" Ingram
       4430 Standing Pine Road
       Carthage, Mississippi
       Fact witness - Regarding his job, work relationship with plaintiff, his understanding
       of plaintiff's medical condition prior to August 21, 1999 and his responsibilities and
       activities during emergency evacuation and anything else covered in his deposition.

(6)    Carl Jordan
       222 Country Line Church Road
       State Line, Mississippi
       Fact witness - Regarding his job, work relationship with plaintiff, his understanding
       of plaintiff's medical condition prior to August 21, 1999 and his responsibilities and
       activities during emergency evacuation and anything else covered in his deposition.

(7)    Bobby Westbrooks
       1374 Gunter Road
       Florence, Mississippi
       Fact witness - Regarding his job, work relationship with plaintiff, his understanding
       of plaintiff's medical condition prior to August 21, 1999 and his responsibilities and
       activities during emergency evacuation and anything else covered in his deposition.

(8)    Randy Farmer
       2170 Park Road
       New Braunfels, Texas 78132

Fact witness - Regarding his work relationship with plaintiff, plaintiff's condition, work capabilities before August 21, 1999; his work departure time on August 21, 1999, his conversations with Bobby Westbrooks about leaving D/B before the plaintiff.

(9)    Trina Allison
        8807 Carville Lane
        Houston, Texas
        Fact witness who may testify concerning her discussions with plaintiff regarding his medical condition, work assignments, and what Transocean was going to do to take care of the plaintiff.

(10)   Michael C. Molleston, M.D.
        5003 Hardy Street, Suite 401
        Hattiesburg, Mississippi 39402
        Treating physician who may testify regarding diagnosis, treatment, and causation of the plaintiff's cervical problems and disability assessment.

(11)   Lawrence L. Line, M.D.
        Southern Bone & Joint
        5003 Hardy Street
        Hattiesburg, Mississippi 39402
        Treating physician who may testify regarding diagnosis, treatment, and causation of the plaintiff's right shoulder problems and disability assessment.

(12)   Srinivas S. Gangi, M.D., FRCPC, FAAN
        205 Highland Park Plaza
        Covington, Louisiana 70433
        Expert who may testify regarding his assessment of plaintiff's disability prior to August 1999.

(13)   John B. Logan, M.D.
        101 East Fairway Drive
        Covington, Louisiana 70433
        Expert - Plaintiff's office visit, his findings and opinion regarding symptoms of person with cervical problems and rotator cuff tear and his office records of plaintiff and his opinion regarding plaintiff's ability to return to work.

(14)   J. Stephen Beam, M.D.
        231 Methodist Boulevard
        Hattiesburg, Mississippi 39404
        Expert

30

(15)    Roy A. Kite, III, M.D.
         Open MRI & Imaging Center of Northshore, L.L.C.
         67250 Industry Lane
         Covington, Louisiana 70433
         Examining Radiologist - results of the September 9, 1999 MRI study.

(16)    Medical Records Custodian
         Wesley Medical Center
         5001 Hardy Street
         Hattiesburg, Mississippi 39404
         Regarding plaintiff's hospital records of plaintiff's neck and shoulder surgeries in
         2000.

(17)    Barney C. Hegwood
         Vocational Counselor
         Jennifer Palmer & Company
         4500 Clearview Parkway, Suite 100
         Metairie, Louisiana 70006
         Vocational Expert who may testify that plaintiff is now unemployable.

(18)    John Keeton
         4 Greenway Plaza
         Houston, TX 77046
         Fact witness - testimony surrounding the facts and circumstances of Myers C.
         Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
         overall general condition and physical ability, facts, circumstances surrounding the
         hurricane evacuation, and absence of any report of on the job injury and future
         employment on rig.

(19)    Any other witness listed by any other party.


**13B.    WITNESSES BY TRANSOCEAN:**

**Will Call Witness List for Transocean:**

(1)     Perry Hamburger - 4 Greenway Plaza, Houston, TX 77046
         Fact witness - testimony surrounding the facts and circumstances of Myers C.
         Thurman's employment, and discussions about retirement/disability settlement
         package.

31

(2)    Karen Cothran - 4 Greenway Plaza, Houston, TX 77046
Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, and discussions about retirement/disability settlement package.

(3)    Bobby Westbrooks - 4 Greenway Plaza, Houston, TX 77046
Fact witness- testimony surrounding the facts and circumstances of Myers C. Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's overall general condition and physical ability, facts, circumstances surrounding the hurricane evacuation, and absence of any report of on the job injury.

(4)    James Ingram - 4 Greenway Plaza, Houston, TX 77046
Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's overall general condition and physical ability, facts, circumstances surrounding the hurricane evacuation, and absence of any report of on the job injury.

**May Call Witness List for Transocean:**

(5)    Carl Jordan - 4 Greenway Plaza, Houston, TX 77046
Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, his overall general condition and physical ability, and desire to return to the rig.

(6)    Randy Farmer - 4 Greenway Plaza, Houston, TX 77046
Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's overall general condition and physical ability, facts, circumstances surrounding the hurricane evacuation, and absence of any report of on the job injury.

(7)    Jimmy Pilcher - 4 Greenway Plaza, Houston, TX 77046 Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's overall general condition and physical ability, facts, circumstances surrounding the hurricane evacuation, and absence of any report of on the job injury.

(8)    John Keeton - 4 Greenway Plaza, Houston, TX 77046
Fact witness - testimony surrounding the facts and circumstances of Myers C. Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's overall general condition and physical ability, facts, circumstances surrounding the hurricane evacuation, and absence of any report of on the job injury and future employment on rig.

32

(9)     Michael Hall - 4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury and future
        employment on rig.

(10)    Ricky Cooper -  4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury.

(11)    Jim E. Evans - 4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury.

(12)    Dennis Swanson - 4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury.

(13)    C. Henderson - 4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury.

(14)    J. Freeman - 4 Greenway Plaza, Houston, TX 77046
        Fact witness - testimony surrounding the facts and circumstances of Myers C.
        Thurman's employment, duties on the rig, help provided to plaintiff as well, plaintiff's
        overall general condition and physical ability, facts, circumstances surrounding the
        hurricane evacuation, and absence of any report of on the job injury.

(15)    Carlon Craig, or Representative of Petroleum Helicopters, Inc., P.O. Box 90808, 113
        Borman Drive, Lafayette, LA 70508
        Fact witness - testimony regarding PHI records.

(16) Louis Fenner, Representative of Unocal (Spirit Energy, Inc.), 14141 Southwest Freeway, Sugar Land, Texas 77478-3435.
Fact witness - testimony regarding circumstances surrounding hurricane evacuation.

(17) E. Harness - Representative of Unocal (Spirit Energy, Inc.), 14141 Southwest Freeway, Sugar Land, Texas 77478-3435.
Fact witness - testimony regarding circumstances surrounding hurricane evacuation.

(18) Glen Anthony, Representative of Unocal (Spirit Energy, Inc.), 14141 Southwest Freeway, Sugar Land, Texas 77478-3435.
Fact witness - testimony regarding circumstances surrounding hurricane evacuation.

(19) Joe Montgomery, P.O. Box 113, Poplarville, MS 39470
Fact witness - testimony regarding discussion with Perry Hamburger about the retirement/disability package.

(20) John Logan, M.D., 101 East Fairway Drive, Covington, LA 70433
Medical witness - medical examination of plaintiff.

(21) Richard Sabatier, M.D.; 109 Northpark Blvd., Suite 210, Covington, LA 70433-5027
Medical witness - medical examination of plaintiff.

(22) Michael C. Molleston, M.D.; 5003 Hardy Street, Suite 401, Hattiesburg, MS 39402
Medical witness - treating physician of plaintiff who performed surgery on plaintiff's back.

(23) J. Stephen Beam, M.D.; 231 Methodist Blvd., Hattiesburg, MS 39404
Medical witness - physician who performed a functional or disability capacity evaluation of plaintiff.

(24) Susan Bryant, M.D., 101 East Fairway Drive, Covington, LA 70433
Medical witness - medical examination of plaintiff.

(25) William R. Knight, M.D., Mercy Medical Office Building, 3535 Bienville Street, Suite 210, New Orleans, LA 70119
Medical witness - physician who performed a medical and functional capacity evaluation of plaintiff.

14.    This is a jury trial with respect to CA#00-0191 and a Bench Trial as to the CA#00-0227 and

issues raised in that lawsuit.

Proposed jury instructions, special jury interrogatories, trial memoranda and any special

questions that the Court is asked to put to perspective juror or voir dire shall be delivered to

the Court and opposing counsel no later than five working days prior to the trial date, unless

specific leave to the contrary is granted by the Court.


15.    The issue of liability  (will or will not) be tried separately from that of quantum.


16.    The parties are not aware of any other matters that might expedite a disposition of the case.


17.    Trial shall commence on **Monday, February 12, 2001 at 8:30 a.m.**  A realistic estimate of

the number of trial days is 2 days.


18.    This Pre-Trial Order has been formulated after conference at which counsel for the respective

parties have appeared in person.  Reasonable opportunity has been afforded counsel for

corrections, or additions, prior to signing.  Hereafter, this order will control the course of the

trial and may not be amended except by consent of the parties and the Court, or by order of

the Court to prevent manifest injustice.

19.    Possibility of settlement of this case was considered.

New Orleans, Louisiana, this
23rd day of January. 2001

_____
UNITED STATES DISTRICT JUDGE

_____
**Harvey J. Lewis, T.A. (#8840)**
LEWIS, KULLMAN & STERBCOW
601 Poydras Street, Suite 2615
New Orleans, Louisiana 70130
(504) 588-1500

_____
**Timothy W. Cerniglia, T.A. (#3964)**
Charles E. Weaver, Esq. (#17528)
Sharp, Henry, Cerniglia
 Colvin & Weaver, L.L.C.
2117 World Trade Center
#2 Canal Street
New Orleans, Louisiana  70130
Telephone: (504) 586-1555

* Subject to
a Minute
Entry of this
day.